UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

AMANDA MITCHUM,

                              Plaintiff,                1:11-CV-0178
                                                  (GTS/DRH)

v.

ITT EDUC. SERVS., INC.,

                              Defendant.
_____

APPEARANCES:                                OF COUNSEL:

SUSSMAN & WATKINS                 MICHAEL H. SUSSMAN, ESQ.
   Council for Plaintiff
55 Main Street, Suite 6
P.O. Box 1005
Goshen, NY 10924

NIXON PEABODY LLP                    JOHN E. HIGGINS, ESQ
   Counsel for Defendant
677 Broadway, 10th Floor
Albany, NY 12207

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

      Currently before the Court, in this employment discrimination action filed by Amanda

Mitchum ("Plaintiff") against ITT Educational Services, Inc. ("Defendant" or "ITT"), is

Defendant's motion for summary judgment. (Dkt. No. 32.) For the reasons set forth below,

Defendant's motion is granted, and Plaintiff's Complaint is dismissed.

## I.   RELEVANT BACKGROUND

### A.   Plaintiff's Complaint

Generally, liberally construed, Plaintiff's Complaint alleges that Plaintiff, an African-American female, was terminated from her employment at ITT on the basis of her race. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) More specifically, Plaintiff alleges as follows.

In 2008, Defendant hired a new director, Michael Mariani, a Caucasian. (*Id.*) At the time, Plaintiff was the Registrar of ITT, where she was the only minority administrator (along with her assistant). (*Id.*) Shortly after his arrival, Mr. Mariani began altering longstanding ITT policies and procedures.  (*Id.*)  Among these changes was the prospective elimination of the "dual major option," by which enrollees could concurrently have two majors. (*Id.*)

After the implementation of that new policy, Defendant's academic departments rebelled against the new policy and allowed students to switch back and forth between majors throughout their studies, thereby perpetuating dual majors.  (*Id.*) Plaintiff reported the departmental circumvention of his new policy to Mr. Mariani on two occasions. (*Id.*)

However, Mr. Mariani took no effectual measures to enforce his new policy with the administrators who were circumventing it. (*Id.*)  Instead, he terminated Plaintiff for "believing" the former dean (i.e., Dan Nicolaescu, who was terminated months before Plaintiff and for entirely different reasons), for permitting dual majors, and for (Mr. Mariani claimed) being responsible for certain allegedly missing documents from the dual majors' files. (*Id.*)

However, these reasons were entirely pretextual.  (*Id.*) This is because, when he fired Plaintiff on February 1, 2012, Mr. Mariani knew that white administrators had intentionally circumvented the same policy he claimed Plaintiff had violated and had not imposed any

sanctions or discipline upon them (including Dean Nicolescu and Associate Dean Berryman and members of the finance team, each of whom signed off on dual majors after Mr. Mariani directed that the practice desist). (*Id*.) In addition, the documents that Mr. Mariani claimed Plaintiff was responsible for were not the responsibility of the Registrar–a fact that Plaintiff explained to Mr. Mariani on February 1, 2010.  (*Id*.)

Despite this fact, Mr. Mariani terminated Plaintiff and replaced her with a Caucasian. (*Id*.)  Following her termination, Plaintiff has not found comparable employment, despite diligent efforts to do so. (*Id*.) Because of Defendant's actions, Plaintiff has been denied substantial income and benefits and has suffered substantial emotional distress, anxiety, anguish and stress, resulting in her suffering the loss of a child she had been carrying. (*Id.*)

Based on these (and other) factual allegations, Plaintiff's Complaint asserts the following three claims: (1) a claim of race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"); (2) a claim of race discrimination under 42 U.S.C. § 1981; and (3) a claim of race discrimination under Section 296 of the New York State Human Right's Law ("NYHRL"). (*Id.*)  Familiarity with the remaining factual allegations supporting these claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id.*)

**B.** **Undisputed Material Facts**

Unless otherwise noted, the following recitation of material facts is derived from a comparison of Defendant's record-supported factual assertions in its Statement of Material Facts ("Rule 7.1 Statement") and Plaintiff's response thereto ("Rule 7.1 Response").  (*Compare* Dkt. No. 32, Attach. 2 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 38 [Plf.'s Rule 7.1 Response].)

### 1.     Background Facts About the Parties

Defendant owns and operates a group of ITT Technical Institutes, "all of which are part of a leading private college system focused on technology-oriented programs of study and actively involved in the higher education community in the United States since 1969."

Plaintiff, who is African-American, was initially hired by Defendant as a sales representative at ITT in 2001. She was promoted to the position of Registrar of ITT's Albany campus on February 4, 2004, and she remained in that position until she was terminated six years later, on February 1, 2010.

At the time of her termination, Plaintiff reported directly to Michael Mariani, who was the Director of ITT's Albany campus at the time. Mr. Mariani was promoted to this position effective April 1, 2008, after working in a variety of other positions for ITT's campus in Getzville, New York.

### 2.     Plaintiff's Responsibilities as Registrar

As the Registrar, Plaintiff was one of five functional managers of ITT's Albany campus who reported directly to Mr. Mariani; the four others were the Dean, the Director of Finance, the Director of Recruitment, and the Director of Career Services. In general, Plaintiff was responsible (as the Registrar) for "managing student course scheduling . . . in accordance with Company goals and objectives," and "manag[ing] student records and enrollment status from admissions through graduation." In addition to these general responsibilities, Plaintiff was required (as the Registrar) to perform a number of "essential job functions," including the following: (1) managing the college's course scheduling system and processes; (2) determining course schedules for students and resolving conflicts with the Dean regarding student and course

schedules; (3) managing requests for student program and course status changes, student requests for transcripts, and enrollment and/or degree verification; (4) conducting degree audits to ensure students met program requirements and approving graduation eligibility of students; and (5) directing the maintenance and security of student admissions and security records. No other functional manager of ITT's Albany campus had these same specific duties and responsibilities, and no other functional manager was responsible (as was Plaintiff) for actually registering students for programs and scheduling them for courses.[1]

In addition, Plaintiff was the "policy owner" of ITT's Registration Admissions Policy Manual, which governed her duties as Registrar. Plaintiff knew that she was an "at will employee," and that she could be terminated by ITT at any time and for any lawful reason. Plaintiff also knew that ITT reserved the right under its policies to terminate any employee immediately, and without any lesser forms of corrective action depending on the circumstances, if deemed necessary by Human Resources. Among other things, ITT Albany has a written "Corrective Action Process," which generally consists of three levels of discretionary action, and which states as follows, in pertinent part:

> The corrective action process is applied at the sole discretion of ITT[] and begins at any time and at any level deemed appropriate by ITT[]. . . . Depending on the situation . . . ITT[] may . . . modify [or] omit . . . any corrective action without reference to the levels of corrective action. ITT[] also reserves the right to terminate employees immediately, if such action is deemed necessary by Human Resources. All corrective actions are determined on a case-by-case basis and at the discretion of ITT[].

(Dkt. No. 37, Attach. 5, at 2.)

---

[1] (*See, e.g.,* Dkt. No. 32, Attach. 1, at ¶ 7 [Smith Affid.]; Dkt. No. 32, Attach. 1, at 12-30 [attaching job descriptions]; Dkt. No. 33, Attach. 6, at 14 [attaching letter]; Dkt. No. 33, Attach. 11, at 32, 33, 38 [attaching pages 128, 129, 130, 131 and 151 of Plf.'s depo. transcript, admitting fact]; Dkt. No. 33, Attach. 12, at 158-59 [attaching pages 158 and 159 of Mariani's depo. transcript].)

### 3.     Plaintiff's Job Performance Generally

Between approximately February of 2003 and February of 2009, Plaintiff received reviews with a final rating of "standard" or "usually above standard."  (Dkt. No. 33, Attach. 5, at 2-17; Dkt. No. 34, Attach. 1, at 3-43.)  In addition, in 2009, she received a "Manager of the Year" award.[2]

In approximately June of 2008, Plaintiff asked Director Mariani for training for advancement, although she did not ask to be enrolled in any particular training program.[3]  He responded, "Okay, we'll talk about it."[4]

In approximately September of 2008, Director Mariani stopped Plaintiff's practice of pulling from class students who had not, within 30 days of starting class, provided to ITT Albany his or her immunization records (which were required by New York State law): specifically, he directed her to, instead of pulling the students from class, send them additional correspondence and then, if they still failed to provide the immunization records, direct them to go speak to Director Mariani personally.[5]

---

[2]     The Court will assume this fact to be true (for the purposes of Defendant's motion) even though Plaintiff does not provide an accurate record citation in support of it.  (*See* Dkt. No. 37, Attach. 2 [not containing documents stamped "PLTF000003-18" and "PLTF000095-99"].)

[3]     (Dkt. No. 33, Attach. 11, at 50-51.)

[4]     (Dkt. No. 33, Attach. 11, at 51.)  They subsequently talked about it at her first performance review with Director Mariani, in 2009.  (*Id.*)

[5]      (Dkt. No. 33, Attach. 11, at 50.)

### 4.    Plaintiff's Registration of "Dual Majors"

As of at least May of 2006, ITT's Albany campus permitted students to enroll in dual programs of study; at the time, Plaintiff had certain questions for Lisa Burr (ITT's National Register at the time) regarding the process.[6]  By mid-June of 2006, Plaintiff was required to document the "[d]ual [m]ajor process" (pursuant to which any student who wished to dual enroll had to send an email to the Dean with an official request, the Dean approved or denied the request in an email to the Registrar, and, if approved, the request would generate additional paperwork).[7]

On April 1, 2008, when Michael Mariani became Director of ITT's Albany campus, the practice of dual enrollment was still in existence.   However, the same day on which Mariani became Director, Ms. Burr sent Plaintiff an email message asking, "Why does Albany allow students to be enrolled in two programs under the 'cloak' of only one program in [ITT's internal computer system]?"[8]

Shortly after his arrival, Director Mariani announced the prospective elimination of the dual-enrollment option.[9]  For example, at some point before November 5, 2008, Director Mariani

---

[6]    (Dkt. No. 33, Attach. 7, at 1-2 [attaching email dated May 22, 2006]; *cf.* Dkt. No. 33, Attach. 7, at 6 [attaching email dated July 3, 2007].)

[7]    (Dkt. No. 33, Attach. 7, at 3-5.)

[8]    (Dkt. No. 33, Attach. 7, at 21 [attaching email]; Dkt. No. 33, Attach. 11, at 97 [attaching pages 327-28 of Plf.'s depo. transcript, admitting fact].)

[9]    (Dkt. No. 1, at ¶ ¶10-11 [Plf.'s Compl., alleging that, "[s]hortly after his arrival, Mariani altered longstanding [ITT] policies and practices," including the "the dual major option"].)  It is worth noting that, as of at least September 8, 2008, Plaintiff was still enrolling dual majors.  (Dkt. No. 33, Attach. 7, at 13 [attaching email dated Aug. 25, 2008]; Dkt. No. 33, Attach. 7, at 25-33 [attaching emails dated between Sept. 4, 2008, and Sept. 8, 2008].)

sent an email to Plaintiff advising her that dual majors were not allowed.[10]

Subsequently, Director Mariani created an exception for students previously enrolled in dual degrees. Specifically, in an email dated Wednesday, November 5, 2008, from Director Mariani to Dean Dan Nicolaescu, Associate Dean Jerald "Greg" Berryman, Plaintiff, Finance Director Cathleen Bender, and Career Services Director Lisa Scaccia, on the subject of "Dual Degrees," Director Mariani explained as follows:

> I am sending out this email again as a reminder and to clarify some additional items. No student is allowed to enroll in two programs at the time here at ITT Tech Albany. Students must complete 1 degree before enrolling into another. Originally I said that those enrolled in one school of
>  study could not take classes in another school of study at the same time.
>
> That still holds true but in addition, going forward, NO students, regardless of situation are permitted to take classes in two programs at the same time regardless of school of study. If a student is interested in a dual degree they must finish their first program before pursuing another. *For those [students] already enrolled in this [dual degree] situation they can continue to pursue both degrees.*
>
> This is a final decision and not open for further discussion. Thank you for your cooperation.

(Dkt. No. 33, Attach. 7, at 37 [emphasis added].)

At some point between November 5, 2008, and March 1, 2009, Director Mariani eliminated the exception for students previously enrolled in dual degrees, and communicated that decision to his managers.[11] While he asserts these managers included Plaintiff,[12] Plaintiff asserts

---

[10]     (Dkt. No. 33, Attach. 11, at 60 [attaching pages 239-40 of Plf.'s depo. transcript, admitting that, "[s]ometime prior" to Dir. Mariani's email message of Nov. 5. 2008, she received an email saying "something to the effect of dual majors were not allowed"].)

[11]     (Dkt. No. 33, Attach. 12, at 76-77 [attaching pages 76 and 77 of Mariani's depo. transcript, testifying that, "there was a conversation between [November 5, 2008, and March 1, 2009] with not only Amanda and Dan but the group in general that once more information was learned when it came to the financial aid Title IV portion, that going forward even those students

that she was never advised of the elimination of the exception.[13]

In any event, in accordance with the revised policy, on September 28, 2009, Director Mariani sent an email to Associate Dean Berryman, Plaintiff, her assistant Theresa Surgick (who, like Plaintiff, is also African-American), and other ITT employees (including but not limited to Career Services Director Scaccia, and new Dean Angelo Markantonakis)[14] on the subject of a particular student (Garrett Gokey) who, according to Plaintiff, was "one of the dual majors that we have been attempting to phase out."[15] Plaintiff responded by acknowledging that she had registered the student in question as a dual major at the request of Associate Dean Berryman, saying, "We did this." After Plaintiff suggested that "[p]erhaps" she, Director Mariani, Dean Markantonakis, and Associate Dean Berryman "should speak briefly and determine how to move forward with these dual majors so that it does not become a nightmare,"

_____

who initially were said to have been enrolled and continue, needed to be . . . put back into one program only"]; Dkt. No. 33, Attach. 12, at 79-80 [attaching pages 79 and 80 of Mariani's depo. transcript, testifying that he "altered the grand fathering policy . . . [not] long after November 5 of 2008" by "discuss[ing] [the new directive] with the individuals and the group" in a "manager meeting"]; Dkt. No. 33, Attach. 12, at 138 [attaching page 138 of Mariani's depo. transcript, testifying that, at the manager meetings, "I made it clear to all managers . . . that dual enrollments were not permitted and the rationale as to why"].)

[12]    (Dkt. No. 33, Attach. 12, at 79-80 [attaching pages 79 and 80 of Mariani's depo. transcript]; Dkt. No. 33, Attach. 12, at 138 [attaching page 138 of Mariani's depo. transcript].)

[13]    (Dkt. No. 39, at ¶ 39 [Plf.'s Affid.].)

[14]    Angelo Markantonakis took over as the Dean of ITT's Albany campus in September 2009, following Dan Nicolaescu's termination as Dean in August 2009 (for reasons unrelated to the "dual major" issue).

[15]    It appears that, at the time, Mr. Gokey was enrolled in only the "Web" program, but was permitted by Plaintiff to also take one or more classes in the "MM" (or Multi-media) program, in reliance on Director Mariani's email of November 5, 2008. (Dkt. No. 37, Attach. 3, at 3; Dkt. No. 37, Attach. 10, at 2; Dkt. No. 37, Attach. 13, at 4.) It appears that Josh Retell was in a similar circumstance, being enrolled in the "Web" program but also being permitted to take one or more classes in the "CNS" (or Computer Networking Systems) program. (Dkt. No. 37, Attach. 10, at 2-3.)

Director Mariani responded by saying, in part, as follows: "As we have spoken about in the past dual degrees are not authorized. A student must complete one program before taking another." On the same day, Dean Markantonakis responded to the same email from Plaintiff by saying simply, "I agree, those need to go away."[16]

In addition, both before and after the email of September 28, 2009, Director Mariani explained to Plaintiff that, "in any circumstance, regardless of whether they have one program or one class left to take," students are not allowed to be enrolled in dual degrees.[17]

Moreover, on November 16, 2009, Dean Markantonakis sent an email to Associate Dean Berryman, as well as to Director Mariani and Plaintiff. In that email, Dean Markantonakis clearly advised both Associate Dean Berryman and Plaintiff that a request by Associate Dean Berryman (previously sent to Plaintiff) to approve a dual major for yet another student, Monique Bonet, would not be approved:

> We are unable to accommodate [Ms. Bonet] with these possibilities. We do not offer dual degrees at our campus. I would encourage [Ms. Bonet] on the long term benefits of finishing her degree in CNS and then transitioning accordingly to WEB.

(Dkt. No. 37, Attach. 13, at 5-6 [attaching email].)

A similar email was sent later that day by new Recruitment Director Scaccia to Dean Markantonakis, regarding the same student. In that email, Recruitment Director Scaccia (one of several Caucasians who directly reported to Director Mariani, and to whom Plaintiff compares

_____

[16]     In her Rule 7.1 Response, Plaintiff asserts that, in making this remark, Dean Markantonakis was not agreeing with Director Mariani's statement that dual degrees are no longer authorized but with Plaintiff's suggestion that nightmares from dual majors should be avoided. (Dkt. No. 38, at ¶ 77.) However, this assertion find no factual basis in the record evidence cited by Plaintiff, which does not support the strained construction proffered by Plaintiff. (Dkt. No. 39, at ¶ 9 [Plf.'s Aff.]; Dkt. No. 37, Attach. 3, at 2 [attaching email].)

[17]     (Dkt. No. 33, Attach. 12, at 84-85.)

herself) stated, "I know we have stopped the dual degree process here at ITT, but [Ms. Bonet] did start back in June of 2008."; however, no exception was made for Ms. Bonet "due to the fact that dual degrees are not permitted."[18]

Plaintiff took no steps to dual enroll Ms. Bonet. However, after receiving Director Mariani's emails of November 5, 2008, and September 28, 2009, Plaintiff continued to register other students in dual degree programs without authorization by Director Mariani; she did this under the belief that "grand fathered" students were an exception.[19]

As a result, during a meeting in Plaintiff's office on January 14, 2010, Director Mariani confronted her regarding her behavior, asking, "Why have these dual majors been processed?" Plaintiff admitted that she had been registering students for dual degrees for some time without him knowing about it. She gave Director Mariani two emails that had been sent to her by former-Dean Nicolaescu (before his termination on August 26, 2009), in which former-Dean Nicolaescu asked Plaintiff to switch certain students' enrollments to give them classes in two different programs. Plaintiff knew at the time of the requests that a dual-major conflict would be created by processing the requests. Plaintiff admitted to Director Mariani that she had made a "mistake" when she had done as former-Dean Nicolaescu requested without first asking for Director Mariani's input or approval. She also admitted that she "erroneously believed that

_____

[18]     (Dkt. No. 39, Attach. 5 at 2-3 [attaching email].)

[19]     (*See, e.g.,* Dkt. No. 33, Attach. 12, at 155-56 [attaching pages 155 and 156 of Mariani's depo. transcript]; Dkt. No. 33, Attach. 11, at 85-88 [attaching pages 279-90 of Plf.'s depo. transcript, admitting fact]; Dkt. No. 39, at ¶ 22 [Plf.'s Affid., stating that, after November 5, 2008, we "respected those dual enrollments as grandfathered," and arguing that "[t]o the extent I was fired because I continued to dual enroll grandfathered students after November 5, 2008, this complied with [the] policy [of November 5, 2008]"]; Dkt. No. 39, at ¶ 26 [Plf.'s Affid., stating that "I do admit that I continued to register some students in dual degree programs after September 28, 2009, but these were students grandfathered by the November 5, 2008, policy"].) *See also, supra,* note 15 of this Decision and Order.

former-Dean Nicolaescu would talk to Director Mariani about it;" however, according to Director Mariani, former-Dean Nicolaescu never did.

### 5. Defendant's Termination of Plaintiff

At the request of Director Mariani for Plaintiff's termination, a compliance review was conducted by himself, Chris Carpentier (ITT's Director of Compliance) and Julie Smith (the ITT's Human Resources Partner).

On or before January 20, 2010, as he was asked to do by ITT headquarters as part of a compliance investigation, Director Mariani removed from Plaintiff's office the files of several students, for which he apparently had previously asked Plaintiff in order to research the issue of dual majors. (Dkt. No. 33, Attach. 7, at 52; Dkt. No. 41, at ¶ 12 [Mariani's Reply Affid.].)[20] No admissible record evidence exists that Director Mariani misplaced or destroyed any of those files.[21]

At his deposition in this action, Director Mariani testified that the decision to terminate Plaintiff instead of issuing a final warning came about when, after further investigation, it was learned that "enrollment agreements and proper disclosures for both programs were missing in several of the files." Director Mariani explained that this deficiency was especially critical because Plaintiff, as Registrar, functioned as the "gatekeeper;" that is, it was Plaintiff's responsibility as Registrar to "ensure that all the student files are in complete form related to

---

[20]     It should be noted that, on January 21, 2010, Plaintiff sent Director Mariani an email stating that she knew he had taken the files in order to research the dual-major issue, and offering assistance if he needed help resolving the matter. (Dkt. No. 33, Attach. 11, at 46, 48 [attaching pages 181 and 189 of Plf.'s depo. transcript]; Dkt. No. 33, Attach. 4, at 2.)

[21]     (*See, e.g.*, Dkt. No. 41, at ¶¶ 5, 9-10 [Mariani's Reply Affid.]; *cf.* Dkt. No. 39, at ¶¶ 16-17, 30 [Plf.'s Affid., providing only speculation and conjecture based on lack of personal knowledge].)

student enrollments, student documents and disclosures . . . [which] were housed while the student was attending in the registrar's office."  As explained above, the Corrective Action Process expressly reserved to Defendant the right to "repeat, modify, omit or employ any corrective action without reference to the levels of corrective action," and to "terminate employees immediately if such action is deemed necessary by human resources."

The proffered reasons for Plaintiff's termination were her (1) failure to comply with Director Mariani's directive to not register students in dual-degree programs, and (2) failure to fulfill her duty to keep accurate and complete documentation for the programs in which the students were enrolled.[22]

Director Mariani stated that he did not believe that Mr. Carpentier, Ms. Smith or Ms. Burr even knew that Plaintiff was African-American at the time the decision to terminate her employment was made. Director Mariani never said anything negative, offensive, insensitive, or inappropriate about Plaintiff's race, color, sex or any other unlawful factor, and the topic of Plaintiff's race and/or color simply was not discussed and did not ever come up in conversation or communications between Director Mariani, Ms. Smith, Mr. Carpenter, Ms. Burr, and Terry Nighan (Manager of ITT's Northeast District) about Plaintiff and her performance. In a letter dated January 28, 2010, it was determined by Director Mariani, in consultation with Ms. Smith, that Plaintiff's conduct and performance problems were so serious that, in the considered judgment of Director Mariani (as well as of Ms. Smith and the other members of the compliance

---

[22]     (*See, e.g.,* Dkt. No. 34, Attach. 1, at 2 [attaching email from Smith]; Dkt. No. 32, Attach. 1, at ¶ 18-24 [Smith Affid.]; Dkt. No. 33, Attach. 12, at 132-33 [attaching pages 132 and 133 of Mariani depo. transcript].)

team, including Mr. Carpenter), Plaintiffs immediate termination was necessary.[23]

### 6. Defendant's Terminations of Others

It appears that, during approximately the relevant time period, at least four other functional managers of ITT's Albany campus–all Caucasians–were terminated by Defendant. Specifically, it appears that Recruitment Director David Hubbard was terminated for performance reasons in 2009; Finance Director Bender was terminated for performance reasons in 2009; Dean Nicolaescu was terminated for policy violations (unrelated to the "dual major" issue) in 2009; and Recruitment Director Scaccia was terminated for performance reasons in 2010.[24]

### C. Parties' Briefing on Defendant's Motion

### 1. Defendant's Memorandum of Law in Chief

Generally, in support of its motion for summary judgment, Defendant asserts the following two arguments. (*See generally* Dkt. No. 35 [Def.'s Memo. of Law].)

First, argues Defendant, Plaintiff's claim of race discrimination should be dismissed because, based on the current record, there is no genuine dispute of material fact that (a) she was not performing her job satisfactorily (in that she disregarded Director Mariani's directive and

---

[23]  (Dkt. No. 32, Attach. 1, at ¶ 18 [Smith Affid.]; Dkt. No. 34, Attach. 1, at 2 [attaching email from Smith].)

[24]  (Dkt. No. 33, Attach. 11, at 53-54 [attaching pages 210 to 214 of Plf.'s depo. transcript]; Dkt. No. 33, Attach. 21, at 21, 23, 26, 27, 134, 135, 140-42 [attaching pages 21, 23, 26, 27, 134, 135, and 140-42 of Mariani's depo. transcript].)  In her attempt to create a genuine dispute of material fact regarding these assertions, Plaintiff merely argues that "Defendant has failed and refused to provide discovery concerning these individuals to the plaintiff in this case." (Dkt. No. 38, at ¶ 44.)  In addition to the fact that the response is an implicit admission that Plaintiff possesses no record evidence controverting the assertions, such a bare response is not sufficient to create a genuine dispute of material fact under Fed. R. Civ. P. 56(d).  *See Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003) (setting forth four requirements of affidavit).

also failed to keep complete and accurate records), (b) she was not terminated under circumstances giving rise to an inference of intentional discrimination (in that Director Mariani never said anything about her race, the functional managers who were white were not responsible for actually registering students for programs and scheduling them for courses, and Defendant's progressive-discipline program was entirely discretionary in nature), (c) Defendant has articulated legitimate, non-discriminatory reasons for terminating Plaintiff (in that, again, she disregarded Director Mariani's directive and also failed to keep complete and accurate records), and (d) she has not shown those reasons were a pretext for discrimination. (*Id.*)

Second, argues Defendant, Plaintiff's claims for damages should be dismissed because, based on the current record, (a) there is no genuine dispute of material fact that she completely failed to mitigate her damages by failing to diligently look for comparable employment (before going back to school to pursue an advanced degree), and (b) there is no admissible record evidence establishing causation of any physical and/or emotional injuries. (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in response, Plaintiff asserts the following two arguments. (*See generally* Dkt. No. 40 [Plf.'s Opp'n Memo. of Law].)

First, argues Plaintiff, her claim of race discrimination should not be dismissed because (a) she has established a prima facie case of racial discrimination including the fact that she was qualified for her position (in part by adducing admissible record evidence that her recordkeeping was accurate and complete and that she was replaced by a white individual), and (b) she has adduced admissible record evidence from which a rational factfinder could conclude that Defendant's purported non-discriminatory reason for her termination was a pretext for intentional discrimination (for example, through the fact that Plaintiff did not dual enroll any student–other than a "grand fathered dual major"–after November 5, 2008). (*Id.*)

Second, argues Plaintiff, under the circumstances, a jury should decide Plaintiff's request for damages, which involves a determination of whether she satisfied her duty to mitigate her damages, and an evaluation of Plaintiff's testimony regarding her emotional distress. (*Id.*)

### 3.      Defendant's Reply Memorandum of Law

Generally, in reply, Defendant asserts the following two arguments.  ( *See generally* Dkt. No. 43 [Def.'s Reply Memo. of Law].)

First, argues Defendant, (a) Plaintiff cannot create a material issue of fact by contradicting her prior sworn deposition testimony, (b) Plaintiff's Affidavit, Attorney Sussman's Affirmation, and Plaintiff's Counterstatement of Material Facts contradict Plaintiff's sworn deposition testimony, and (c) as a result, the Court should disregard the several qualifying statements provided by Plaintiff in her Rule 7.1 Response. (*Id.*)

Second, argues Defendant, even if the Court finds that Plaintiff has adduced admissible record evidence establishing the second and fourth elements of the *McDonnell Douglas* test, Plaintiff has not adduced sufficient admissible evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by Defendant were false and that more likely than not discrimination was the real reason for her termination.  (*Id.*)

## II.      RELEVANT LEGAL STANDARDS

### A.      Legal Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining whether a genuine dispute of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  In addition, "[the

moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

As for the genuineness requirement, a dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson*, 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].[25] Similarly, inadmissable hearsay is insufficient to create a genuine dispute of fact "absent a showing that admissible evidence will be available at trial." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) [citation omitted]. Moreover, "an affidavit . . . that, by omission or addition, contradicts the affiant's previous deposition testimony" is insufficient to create a genuine dispute of fact. *Hayes v. New York City Dept. of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) [citations omitted].[26]

---

[25] As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[26] *See also Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir.1991) ("It is well-settled that a party may not defeat ... a motion [for summary judgment] by submitting an affidavit that disputes [or contradicts] his prior sworn testimony.");

Finally, as this Court has previously observed, "it is well established that issues of credibility are almost never to be resolves by a court on a motion for summary judgment." *Cruz v. Church*, 05-CV-1067, 2008 WL 4891165, at *4 & n.6 (N.D.N.Y. Nov. 10, 2008) (Suddaby, J.) [emphasis in original; collecting cases]. However, "there is a narrow exception to this well-established rule." *Cruz*, WL 4891165, at *4. In *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), the Second Circuit explained that this narrow exception is for testimony by a non-movant that possesses the following two characteristics: (1) it constitutes almost the exclusive basis for a disputed issue of fact in the case (or, expressed differently, it is largely unsubstantiated by any other direct evidence); and (2) it is so contradictory and incomplete that it will be impossible for a district court to determine whether or not there are any genuine disputes of material fact, without making some sort of credibility determination. *Cruz*, 2008 WL 4891165, at *4 & n.7 [collecting cases]. "Again, it must be remembered that the circumstances giving rise to this exception are rare." *Id.* & n.7 [collecting cases].

### B.      Legal Standards Governing Plaintiff's Claims

Claims of racial discrimination are governed by the well-known burden-shifting analysis announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). This is the case regardless of whether the racial-discrimination claims arise under Title VII, § 1981, or the New York State Human Right's Law. *Ayton v. Lenox Hill Hosp.*, 93-CV-6601, 1997 WL 10000, at *1, n.1 (S.D.N.Y. Jan. 9, 1997) ("Courts require the same standards and burdens of proof for claims brought under Title VII, § 1981, and the NYHRL.") (collecting cases).

---

*Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").

"Under the burden-shifting rules set forth in *McDonnell Douglas* . . . , a plaintiff has the initial burden of making out a prima facie case of discrimination." *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001). For purposes of a disparate-treatment claim, a plaintiff may do so by showing the following: (1) that she belonged to a protected class; (2) that she was qualified for the position she held; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (citing *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 [2d Cir. 2002]).[27] The plaintiff's burden of establishing a prima facie case for discrimination "is not onerous . . . . [but] serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981).

"If a plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination." *Farias*, 259 F.3d at 98. "The defendant is not required to prove that the articulated reason actually motivated its actions." *Id*. "If the defendant fails to discharge the burden by presenting a nondiscriminatory reason, the plaintiff will prevail (assuming the other aspects of the prima facie case are not contested)." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

---

[27] The Court notes that its articulation of the second element is supported by Second Circuit case law. *See, e.g., Slattery v. Swiss Reinsur. Am. Corp.*, 248 F.3d 87, 91-92 (2d Cir. 2001) (finding that district court "overstated the requirements for a *prima facie* case" by requiring plaintiff to show that he was "performing his duties satisfactorily" rather than merely that he was "qualified for the position," which is done by establishing "basic eligibility for the position at issue" or that he "possesses basic skills necessary for performance of the job").

"If the defendant bears its burden of production, the presumption drops out of the analysis . . . and the defendant 'will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.'" *Farias*, 259 F.3d at 98 (quoting *James*, 233 F.3d at 154). "Evidence that the defendant's articulated nondiscriminatory reason is false [or pretextual], when added to the prima facie case, may or may not be 'sufficient to support a reasonable inference that prohibited discrimination occurred' and warrant submitting the case to the jury." *Id*. (quoting *James*, 233 F.3d at 156).

## III.    ANALYSIS

As stated above in Part I.C. of this Decision and Order, Defendant seeks the dismissal of Plaintiff's race discrimination claim because she has failed to adduce admissible record evidence from which a rational factfinder could conclude that the termination of her employment was discriminatory.  Based on the current record, the Court agrees with Defendant.

### A.    Whether Plaintiff Has Made Out a Prima Facie Case of Discrimination

After carefully considering the matter, the Court finds that Plaintiff has met her initial burden of making out a prima facie case of discrimination.  With regard to the first and third elements described above in Part II.B. of this Decision and Order, it is undisputed that (1) Plaintiff is a member of a protected class, and (2) her termination constitutes an adverse employment action for purposes of a disparate-treatment claim.

As for the second element (i.e., that she was qualified for the position she held), Plaintiff has adduced admissible record evidence from which a rational factfinder could conclude that she was qualified for the position she held.  For example, Defendant appointed Plaintiff, instead of other employees or applicants, to the position of Registrar.  *See, supra,* Part I.B.1. of this Decision and Order.  Furthermore, Plaintiff performed her job for a period of nearly six years.

*Id.* Finally, between approximately February of 2003 and February of 2009, Plaintiff received reviews with a final rating of "standard" or "usually above standard." *See, supra,* Part I.B.3. of this Decision and Order. Under the circumstances, she has met her modest burden with regard to this element. *See, supra,* Part II.B. & note 23 of this Decision and Order.

As for the fourth element (i.e., that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent), Plaintiff has adduced admissible record evidence from which a rational factfinder could conclude that her termination occurred under circumstances giving rise to an inference of discriminatory intent, because she was replaced by a Caucasian. *See, e.g., Maioriello v. New York*, 05-CV-1062, 2008 WL 398483, at *10 (N.D.N.Y. Feb. 12, 2008) (Mordue, J.) ("[V]iewing the facts in the light most favorable to plaintiff, the circumstances under which he was terminated give rise to an inference of discrimination on the basis of race because he was replaced by an African-American. Thus, plaintiff has satisfied his minimal burden of demonstrating a prima facie case of race discrimination."); *Davis v. Oyster Bay-East*, 03-CV-1372, 2006 WL 657038, at *9 (E.D.N.Y. March 9, 2006) ("[Plaintiff] was replaced by a Caucasian. Plaintiff has therefore raised an inference of discrimination.").

### B. Whether Defendant Has Shown a Legitimate, Nondiscriminatory Reason for the Termination

After carefully considering the matter, the Court finds that Defendant has met its resulting burden of showing a legitimate, nondiscriminatory reason for Plaintiff's termination. It is undisputed that the two reasons offered by Defendant were Plaintiff's (1) failure to comply with Director Mariani's directive to not register students in dual-degree programs, and (2) failure to fulfill her duty to keep accurate and complete documentation for the programs in which the students were enrolled. (*See, supra,* Part I.B.5. of this Decision and Order.)

As for the first reason (i.e., failing to comply with Director Mariani's directive to not register students in dual-degree programs), it is undisputed that, at some point between November 5, 2008, and March 1, 2009, Defendant Mariani eliminated the exception for students previously enrolled in dual degrees (i.e., the so-called "grand father" exception) *See, supra,* Part I.B.4. of this Decision and Order.  It is also undisputed that, after November 5, 2010, Plaintiff (whether consciously or not) violated that revised policy.  *See, supra,* Part I.B.4. of this Decision and Order.

As for the second reason (i.e., failing to fulfill her duty to keep accurate and complete documentation for the programs in which the students were enrolled), it is undisputed that, during a compliance review, it was determined that enrollment agreements and proper disclosures for dual programs that were missing in several of the files kept by Plaintiff.  *See, supra,* Part I.B.5. of this Decision and Order.

These two reasons, taken together or even individually, constitute a legitimate, nondiscriminatory reason for Plaintiff's termination.

### C. Whether Plaintiff Has Shown that the Reasons Were Pretextual

After carefully considering the matter, the Court finds that Plaintiff has not met her resulting burden of adducing admissible record evidence from which a rational factfinder could conclude that *both* of Defendant's articulated nondiscriminatory reasons for termination (i.e., (i.e., failing to comply with Director Mariani's directive, and failing to keep accurate and complete documentation) were false or pretextual.

Liberally construed, Plaintiff's papers in opposition to Defendant's motion assert the following seven grounds in support of her argument that Defendant's proffered reasons for her termination were pretextual: (1) the fact that Director Mariani purportedly ignored Plaintiff's

request for advancement training; (2) the fact that he purportedly interfered with her job duties regarding the collection immunization records from students; (3) the fact that, with regard to the dual-enrollment policy, he purportedly never eliminated the exception for students previously enrolled in dual degrees and, if he did, he purportedly never communicated that fact to Plaintiff; (4) the fact that Director Mariani did not discipline white managers who were purportedly similarly situated to Plaintiff, despite the fact that they too violated the policy; (5) the fact that he took records from her office purportedly without her permission and then may have lost some of them; (6) the fact that he purportedly failed to follow ITT's system of so-called "progressive discipline"; and (7) the fact that she was replaced by a Caucasian.

As for the first ground (i.e., that Director Mariani purportedly ignored Plaintiff's request for advancement training), it is undisputed that (1) she did not ask to be enrolled in any particular training program, and (2) in any event, he responded, "Okay, we'll talk about it." *See, supra,* Part I.B.3. of this Decision and Order. These facts, together with Plaintiff's failure to show that Director Mariani treated any white manager differently with regard to their requests for advancement training, does not suffice to show that either of Defendant's articulated nondiscriminatory reasons for termination was pretextual.

As for the second ground (i.e., the fact that Director Mariani purportedly interfered with Plaintiff's job duties regarding the collection of immunization records from students), it is undisputed that this "interference" consisted of his replacing her practice of pulling students from class with a practice of issuing additional correspondence and requiring a personal meeting with himself. *Id.* This fact, together with Plaintiff's failure to show that she was sanctioned by New York State (or even that Director Mariani's decision related to dual enrollments or the keeping of enrollment agreements and disclosures), does not suffice to show that either of Defendant's articulated nondiscriminatory reasons for termination was pretextual.

As for the third ground (i.e., the fact that Director Mariani purportedly never eliminated the exception for students previously enrolled in dual degrees and, if he did, he purportedly never communicated that fact to Plaintiff), it is undisputed that, at some point between November 5, 2008, and March 1, 2009, Director Mariani eliminated the exception for students previously enrolled in dual degrees, and communicated that decision to his managers. *See, supra,* Part I.B.4. of this Decision and Order. Regardless of whether Plaintiff was not expressly advised of the revised policy, genuinely did not understand it, or unconsciously did not want to accept it at the time, she clearly had reason to know of that revised policy subsequently–through Director Mariani's repeated articulation and enforcement of a flat prohibition against dual majors (i.e., without exceptions). *Id.* For these reasons, the Court finds that this ground does not suffice to show that Defendant's first articulated nondiscriminatory reason for termination (i.e., failing to comply with Director Mariani's directive) was pretextual.

As for the fourth ground (i.e., the fact that Director Mariani did not discipline white managers who were purportedly similarly situated to Plaintiff, despite the fact that they too violated the revised policy), for the sake of brevity, the Court will not linger on the fact that (1) as of at least November 16, 2009, Recruitment Director Scaccia clearly understood that "we have stopped the dual degree process here at ITT," and (2) Dean Nicolaescu was terminated approximately a year before Director Mariani learned of his role in helping Plaintiff create dual-major conflicts. *Id.* Nor will the Court linger on the fact that performance reasons unrelated to the dual-enrollment policy existed to terminate Recruitment Director David Hubbard and Finance Director Bender before Plaintiff was terminated, making it difficult to imagine how they can be compared to Plaintiff. *See, supra,* Part I.B.6. of this Decision and Order. Nor will the Court linger on the point of law establishing that evidence of differential treatment–without

evidence of racial animus–is insufficient to establish discriminatory intent.[28]  More important is the undisputed fact that no other functional manager of ITT's Albany campus was responsible (as was Plaintiff) for actually registering students for programs and scheduling them for courses. *See, supra,* Part I.B.2. of this Decision and Order.  For all of these reasons, the Court finds that this ground does not suffice to show that Defendant's first articulated nondiscriminatory reason for termination (i.e., failing to comply with Director Mariani's directive) was pretextual.

As for the fifth ground (i.e., the fact that Director Mariani took records from Plaintiff's office purportedly without her permission and then may have lost some of them), it is undisputed that (1) Director Mariani had been asked by ITT headquarters to remove the records from Plaintiff's office, (2) before he did so, he had asked her for such records, (3) he was her supervisor at the time, and (4) afterward, she learned of the removal but did not complain.  *See, supra,* Parts I.B.1. and I.B.5. of this Decision and Order.  Moreover, Plaintiff offers only speculation and conjecture in support of her suggestion Director Mariani may have misplaced or destroyed any of the records.  *See, supra,* Part I.B.5. of this Decision and Order.  Indeed, Plaintiff expressly blames any errors in the records on her subordinates and/or claims the errors were "minor."  (Dkt. No. 39, at ¶ 17 [Plf.'s Affid.].)  She adduces no evidence from which a rational fact finder could conclude that the errors in the records were not sufficient to terminate her at-will employment relationship.  For these reasons, the Court finds that this ground does not

---

[28]     *See Grillo v. N.Y. City Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that [s]he was unfairly singled out for punishment . . . is credited, [plaintiff] has done little more than cite to [alleged] mistreatment and ask the court to conclude that it must have been related to [her] race. This is not sufficient.") (internal quotation marks omitted).  It is important note that the record contains no admissible record evidence from which a rational factfind could conclude that (1) Director Mariani ever said anything about Plaintiff's race, and/or (2) Mr. Carpentier, Ms. Smith or Ms. Burr even knew that Plaintiff was African-American at the time of her termination.  *See, supra,* Part I.B.5. of this Decision and Order.

suffice to show that Defendant's second articulated nondiscriminatory reason for termination (i.e., failing to keep accurate and complete documentation) was pretextual.

As for the sixth ground (i.e., the fact that Director Mariani purportedly failed to follow ITT's system of so-called "progressive discipline), it is undisputed that Defendant's "Corrective Action Process" was entirely discretionary, and could in any event be accelerated, modified or entirely bypassed based on the circumstances. *See, supra,* Part I.B.2. of this Decision and Order. Defendant has adduced evidence that such circumstances existed (*see, supra,* Part I.B.5. of this Decision and Order), and Plaintiff has adduced no evidence from which a rational fact finder could conclude that such circumstances did not exist. For these reasons, the Court finds that this ground does not suffice to show that either of Defendant's articulated nondiscriminatory reasons for termination was pretextual.

Finally, as for the seventh ground (i.e., the fact that Plaintiff was replaced by a Caucasian), being replaced by a Caucasian is not sufficient to rebut a nondiscriminatory reason for termination.[29]  For this reason, the Court finds that this ground does not suffice to show that either of Defendant's articulated nondiscriminatory reasons for termination was pretextual.

---

[29]     *See Davis v. Oyster Bay-East*, 03-CV-1372, 2006 WL 657038, at \*12 (E.D.N.Y. March 9, 2006) ("Plaintiff cites her replacement by a Caucasian stenographer as evidence supporting an inference of discrimination. While Plaintiff's replacement by a Caucasian is sufficient to raise an inference of discrimination in the prima facie case, it does not rebut Defendant's non-discriminatory reasons for Plaintiff's transfer. Thus, because Plaintiff has not offered any evidence showing that her successor was selected because she was Caucasian, the fact that she was Caucasian, without more, is insufficient to show Defendant's proffered explanation to be pretextual."); *Springer v. City of New York*, 01-CV-4392, 2006 WL 526028, at \*5 (E.D.N.Y. March 3, 2006) ("[P]laintiff's assertion that there was discrimination simply because he was replaced by a white person is a very weak rebuttal to defendants' explanation for plaintiff's termination.").

As a result, Defendant's motion is granted, and Plaintiff's discrimination claims are dismissed. Because those claims are dismissed, the Court need not, and does not, reach the merits of Defendant's alternative ground for dismissal (i.e., that Plaintiff's claims should be dismissed based on her failure to mitigate her damages and/or establish causation of any physical and/or emotional injuries).

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 32) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **<u>DISMISSED</u>**. The clerk is directed to enter judgment in favor of the Defendant and close this case.

Dated: September 25, 2013
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge